UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 23-80140-CR-ROSENBERG/REINHART

18 U.S.C. § 1349
18 U.S.C. § 982

UNITED STATES OF AMERICA

v.

VICTOR VAN VICKERY,

Defendant.
_____/

FILED BY ER D.C.

Aug 14, 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

### INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

### The Medicare Program

1.  The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.  Medicare was subdivided into multiple program "parts." Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covered physician services and outpatient care, including an

individual's access to durable medical equipment ("DME"), such as orthotic braces (*e.g.*, knee braces, back braces, shoulder braces, ankle braces, and wrist braces) and wheelchairs. Medicare Part C, also known as the "Medicare Advantage" Program, provided Medicare beneficiaries with the option to receive their Medicare benefits through private managed health care plans, including health maintenance organizations and preferred provider organizations.

3. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

**Medicare Enrollment and Coverage for Durable Medical Equipment**

4. DME suppliers, physicians, and other health care providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application, CMS Form 855S, which includes a certification that the provider will abide by Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and will not submit or cause to be submitted false or fraudulent claims for payment.

5. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

6. Enrolled providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers were required to abide by the Federal Anti-Kickback Statute and other laws and regulations. Providers were given access to Medicare manuals and services bulletins describing billing procedures, rules, and regulations.

7. Medicare reimbursed DME suppliers and other providers for items and services rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare electronically via interstate wires, either directly or through a billing company.

8. A Medicare claim for DME reimbursement was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the DME provided to the beneficiary, the date the DME was provided, the cost of the DME, and the name and unique physician identification number of the physician who prescribed or ordered the equipment.

9. Medicare would only pay for services that were medically reasonable and necessary, eligible for reimbursement, and provided as represented. Medicare would not pay claims for services that were procured through the payment of illegal kickbacks and bribes.

### Telemedicine

10. Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

11. Telemedicine companies provided telemedicine services, or telehealth services, to individuals by hiring doctors and other providers. Telemedicine companies typically paid doctors a fee to conduct consultations with patients. In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

12. Medicare Part B covered expenses for specific telehealth services if certain requirements were met. These requirements included that: (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a

specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner.

13. In or around March 2020, in response to the COVID-19 pandemic and in order to enable access to care during the public health emergency, some of these requirements were amended temporarily to, among other things, cover telehealth services for certain office and hospital visits, even if the beneficiary was not located in a rural area or a health professional shortage area and even if the telehealth services were furnished to beneficiaries in their home.

### Medicare Part D

14. In order to receive Part D benefits, a beneficiary enrolled in a Medicare drug plan. Medicare drug plans were operated by private health care insurance companies, known as "sponsors," approved by Medicare. A Medicare drug plan was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

15. A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription. CMS compensated the Medicare drug plan sponsors for providing prescription drug benefits to beneficiaries. CMS paid Medicare drug plan sponsors a monthly capitation fee for each beneficiary enrolled in the plan. In addition, in some cases where a Medicare drug plan sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's capitation fee, CMS reimbursed the Medicare drug plan sponsor for a portion of those additional expenses.

16. Typically, Medicare did not process its insureds' prescription claims directly. Instead, Medicare drug plans were administered by pharmacy benefit managers ("PBMs"), whose responsibilities included adjudicating and processing payment for prescription drug claims

4

submitted by eligible pharmacies. PBMs also audited participating pharmacies to ensure compliance with their rules and regulations.

17. A pharmacy could participate in Medicare Part D by entering into a provider agreement with a Medicare drug plan sponsor or with a PBM. Pharmacies entered into contractual agreements with PBMs either directly or indirectly. If indirectly, providers first contracted with pharmacy network groups, which then contracted with PBMs on behalf of providers. By contracting with Medicare drug plan sponsors or PBMs, directly or indirectly, pharmacies agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

18. Upon receiving prescriptions, pharmacies submitted claims to Medicare drug plan sponsors or to PBMs for dispensing prescription drugs. Medicare drug plan sponsors and PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

19. Under the Social Security Act, Medicare covered Part D drugs that were dispensed upon a valid prescription and for a "medically accepted indication." 42 U.S.C. § 1395w-102(e). Medicare generally did not cover drugs meant for prevention of disease and only covered drugs meant to treat an existing illness or injury.

20. To prevent fraud, waste, and abuse, Medicare, Medicare drug plans, and PBMs required providers, including pharmacies, to collect copayments from beneficiaries prior to or soon after the service or item was provided and specified that copayments could not be systematically waived or reduced. Consistent copayment collection was a fraud prevention measure, as copayments gave beneficiaries financial incentives to reject medications that were not medically necessary or had little or no value to beneficiaries' treatments.

### The Defendant, Related Entities, and Relevant Persons

21. Defendant **VICTOR VAN VICKERY** was a resident of Palm Beach County, Florida, in the Southern District of Florida.

22. Conspirator 1 was a resident of Archer County, Texas, in the Northern District of Texas.

23. Conspirator 2 was a resident of the Philippines.

24. TB Interests LLC ("TB Interests") was a company formed under the laws of Texas with its principal place of business in Archer City, Texas. TB Interests was owned by **VICKERY** and Conspirator 1, and purportedly provided marketing services.

25. Marketing Company 1 was a company located in the Philippines, which operated a call center. Conspirator 2 managed and controlled Marketing Company 1.

26. DME Company 1 was a company incorporated under the laws of Florida with its principal place of business in Stuart, Florida. Conspirator 1 was the listed owner of DME Company 1. **VICKERY** was a beneficial owner, operator, and manager of DME Company 1. DME Company 1 was a DME supplier that purportedly provided braces to patients, including Medicare beneficiaries.

27. DME Company 2 was a company formed under the laws of Florida with its principal place of business in Stuart, Florida. Conspirator 1 was the listed owner of DME Company 2. **VICKERY** was a beneficial owner, operator, and manager of DME Company 2. DME Company 2 was a DME supplier that purportedly provided braces to patients, including Medicare beneficiaries.

28. DME Company 3 was a company formed under the laws of Florida with its principal place of business in Stuart, Florida. Conspirator 1 was the listed owner of DME

6

Company 3. **VICKERY** was a beneficial owner, operator, and manager of DME Company 3. DME Company 3 was a DME supplier that purportedly provided braces to patients, including Medicare beneficiaries.

29. DME Company 4 was a company formed under the laws of Florida with its principal place of business in Delray Beach, Florida. **VICKERY** was a beneficial owner, operator, and manager of DME Company 4. DME Company 4 was a DME supplier that purportedly provided braces to patients, including Medicare beneficiaries.

30. DME Company 5 was a company formed under the laws of Maryland with its principal place of business in Glen Burnie, Maryland. **VICKERY** was a beneficial owner, operator, and manager of DME Company 5. DME Company 5 was a DME supplier that purportedly provided braces to patients, including Medicare beneficiaries.

## COUNT 1
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

1. The General Allegations section of this Information is re-alleged and incorporated by reference as though fully set forth herein.

2. From in or around August 2018, and continuing through in or around February 2021, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**VICTOR VAN VICKERY,**

did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate, and agree with Conspirator 1, Conspirator 2, and others known and unknown to the United States Attorney, to commit offenses against the United States, that is, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare,

7

and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

3. It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks and bribes in exchange for the referral of Medicare beneficiaries for DME and prescription drugs, without regard to whether the beneficiaries needed the DME and prescription drugs, or whether the DME or prescription drugs were eligible for reimbursement by Medicare; (b) paying kickbacks and bribes to purported telemedicine and marketing companies in exchange for doctors' orders for Medicare beneficiaries, for DME and prescription drugs, knowing that the doctors' orders did not result from a valid doctor-patient consultation; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare, Medicare drug plan sponsors, and PBMs for DME and prescription drugs that were medically unnecessary and ineligible for reimbursement; (d) concealing the submission of false and fraudulent claims to Medicare, Medicare drug plan sponsors, and PBMs; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### Manner and Means of the Conspiracy

The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

8

4. **VICTOR VAN VICKERY** and Conspirator 1 agreed to pay kickbacks and bribes to Conspirator 2, who operated offshore call centers—including Marketing Company 1—that used high-pressure and deceptive tactics to get Medicare beneficiaries to accept DME and prescription drugs.

5. In exchange for these kickbacks and bribes, Conspirator 2 provided **VICTOR VAN VICKERY** and Conspirator 1 with patient information (known as "leads") necessary to bill Medicare, Medicare drug plan sponsors, and PBMs for the DME and prescription drugs, and, in some instances, provided signed doctors' orders for those products.

6. When **VICTOR VAN VICKERY** and Conspirator 1 obtained leads from Conspirator 2 without a signed doctor's order, **VICTOR VAN VICKERY** and Conspirator 1 paid kickbacks and bribes to purported telemedicine companies to have medical practitioners sign off on the orders regardless of medical necessity.

7. **VICTOR VAN VICKERY** and Conspirator 1 would use some of the doctors' orders obtained from Conspirator 2 and the purported telemedicine companies to bill Medicare through DME Company 1, DME Company 2, DME Company 3, DME Company 4, and DME Company 5 for DME that was medically unnecessary and ineligible for reimbursement.

8. **VICTOR VAN VICKERY** and Conspirator 1, through TB Interests, would also sell doctors' orders for medically unnecessary DME and prescription drugs to other DME suppliers, pharmacies, and marketers in exchange for kickbacks and bribes. These DME suppliers and pharmacies would bill Medicare for the DME and prescription drugs prescribed in the doctors' orders.

9. **VICTOR VAN VICKERY** and his co-conspirators caused DME companies and pharmacies to submit at least approximately $23,527,581 in false and fraudulent claims for reimbursement from Medicare for DME and prescription drugs that were medically unnecessary, ineligible for reimbursement, and procured through the payment of illegal kickbacks and bribes. Medicare paid the DME companies and pharmacies at least $10,526,803 as a result of these false and fraudulent claims.

10. **VICTOR VAN VICKERY** and his co-conspirators used the fraud proceeds to benefit themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATIONS

1. The allegations of this Information are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **VICTOR VAN VICKERY**, has an interest.

2. Upon conviction of a violation of Title 18, United States Code, Section 1349, as alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

  e. has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

_[signature]_
MARKENZY LAPOINTE
UNITED STATES ATTORNEY

GLENN S. LEON, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_[signature]_
ANDREA SAVDIE
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO.: _____

v.

VICTOR VAN VICKERY

_____/
            Defendant.

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of counts _____

**Court Division** (select one)
☐ Miami     ☐ Key West     ☐ FTP
☐ FTL       ☒ WPB

I do hereby certify that:
1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No
   List language and/or dialect: _____

4. This case will take __0__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:
   (Check only one)                    (Check only one)
   I   ☒ 0 to 5 days                   ☐ Petty
   II  ☐ 6 to 10 days                  ☐ Minor
   III ☐ 11 to 20 days                 ☐ Misdemeanor
   IV  ☐ 21 to 60 days                 ☒ Felony
   V   ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) Yes
   If yes, Magistrate Case No. 23-mj-08140-BER
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No
15. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No

By: _____
ANDREA SAVDIE
DOJ Trial Attorney
Court ID No.   A5502799

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: _____ **VICTOR VAN VICKERY** _____

**Case No**: _____

Count #: 1

    Title 18, United States Code, Section 1349 _____

    Conspiracy to Commit Health Care Fraud _____
* **Max. Term of Imprisonment:    10 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:   3 years**
* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense**

*Refers only to possible term of incarceration, supervised release and fines.  It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| Victor Van Vickery, | ) | |
| *Defendant* | ) | |

**WAIVER OF AN INDICTMENT**

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*